UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JANE DOE,

    Plaintiff,

v.　　　　　　　　　　　　　　　　Case No.:  2:22-cv-200-JLB-KCD

FELIPE JAVIER VAZQUEZ,

    Defendant.
_____/

## REPORT & RECOMMENDATION

Defendant Felipe Javier Vazquez failed to appear or defend himself in this suit and a default judgment was entered. (Doc. 33.)[1] The case then came before the undersigned for an evidentiary hearing to determine Plaintiff Jane Doe's unliquidated damages on several tort claims arising under Florida and Pennsylvania law (Counts 2, 3, and 5). Doe presented four witnesses besides herself—her mother, her father, Dr. Shelia Rapa, and Anthony Nardotti. Dr. Rapa is a forensic psychologist who evaluated Doe and offered testimony about her psychological needs and treatment. Nardotti is an accountant who testified about Doe's economic damages and their current value. After considering the evidence presented, and for the reasons below, the Court recommends

---

[1] Unless otherwise indicated, all internal quotation marks, citations, and alterations have been omitted in this and later citations.

awarding Doe the damages requested: $1,246,930 in lost earnings and benefits, $188,546.63 in future medical care, and $10,000,000 for pain and suffering.

The facts of this case are distressing. Doe was a minor when Vazquez, then a professional baseball player, groomed her over social media and then molested her. The Court won't belabor the facts of the underlying assault, which are detailed in the complaint and Vazquez's criminal case. But two points add context to understanding Doe's damages. First, she was thirteen at the time. And second, this was her first sexual experience. As Dr. Rapa explained, Doe was completely unequipped at the age of thirteen to navigate a very adult experience and its repercussions.

By all accounts, Doe was a thriving twelve-year-old before the sexual assault. Living in Pennsylvania at the time, she played sports, had a network of friends, and did well in school with aspirations of becoming a teacher. As described by her mom, Doe was a normal kid. Doe's father corroborated this picture. He also recalled Doe having a close relationship with her immediate family. She regularly talked about school and the typical "crises" encountered by an adolescent.

This family dynamic came to a screeching halt shortly after Doe turned thirteen. She withdrew from sports, struggled academically, and started "hanging out with the wrong crowd" according to her father. Doe also became very private, excluding her parents from nearly every aspect of her life. Doe's

family searched for answers to no avail. What they didn't know was that Doe's sexual encounter with Vazquez triggered this dramatic shift in behavior.

Doe's conduct can only be described as a downward spiral. To hide the shame and confusion of what happened with Vazquez, Doe turned to drugs. She also quit caring about school. Things got so bad the family packed up and moved to Florida, hoping the change of scenery would help. It didn't. Doe continued to seek outlets to numb the internal turmoil. For instance, she would regularly lie about her whereabouts and stay out all night. And Doe's mother recalled the cops calling the home more than once.

Everything came to a head when Doe's parents discovered a message from Vazquez on her phone. When confronted, Doe admitted that he had molested her. She also admitted to sending sexually explicit videos and pictures at Vazquez's request. Despite being the victim, Doe blamed herself. She also tried to protect Vazquez. Although seemingly odd from a third-party perspective, Dr. Rapa explained that Doe's behavior was entirely predictable for an abuse victim of her age and situation.

Any reprieve to Doe and her family was short lived, as Vazquez was soon arrested, and her name went public. That's when things really got out of hand. Doe was ostracized. And given Vazquez's stature as a famous baseball player, the bullying (both online and in-person) was incessant. Doe was forced to withdraw from school, which left her further isolated. Doe tried a few

extracurricular activities, such as softball, but people would soon connect the dots and the bullying would begin anew. The result was all too predictable—Doe developed severe depression and anxiety. It got so bad Doe wouldn't leave the house for long periods, and she would only sleep by her mother's side.

Even after the criminal proceedings concluded, Doe's feelings of depression and anxiety continued. According to Doe's mother, she was self-harming and attempted suicide. At that point, Doe was admitted to an in-patient treatment facility. She was diagnosed with severe depression disorder, anxiety, and PTSD. According to Dr. Rapa, in-patient treatment was necessary to stabilize her condition.

Doe is no longer hospitalized, but she continues to struggle. According to Doe's mother, she has no friends and often refuses to leave the house except to work as a babysitter for a local family. Doe confirmed that her anxiety is crippling. For example, she was accepted to the local state college but couldn't leave the house without breaking into tears. Doe feels "everyone knows everything about her," and she often feels shame talking to even close family members. At bottom, Doe reports she cannot function in even basic social settings.

Dr. Rapa corroborated Doe's psychiatric symptoms. She diagnosed Doe with PTSD, panic disorder, and major depression. And while Dr. Rapa admits Doe has made progress, she is not where she needs to be. According to Dr.

Rapa, Doe will keep experiencing these debilitating symptoms into the future. Doe simply can't navigate the demands of life.

Dr. Rapa also administered several tests while examining Doe. Here are the highlights: Doe scored high on anxious arousal and anxiety; depression in a clinically significant range; defensive avoidance in the clinically significant range; impaired self-reference (meaning she cannot understand her feelings); and debilitating depression.

Two other things are important about Dr. Rapa's testimony. First, she linked Doe's psychiatric problems directly to Vazquez. Dr. Rapa administered the Detailed Assessment of Posttraumatic Stress (DAPS), which is a comprehensive clinical measure of trauma exposure and posttraumatic stress. Doe's answers identified the underlying trauma as sexual abuse. Second, Dr. Rapa testified that Doe's symptoms were not manufactured or exaggerated. Using objective testing, Dr. Rapa confirmed that Doe presented a "valid profile" and thus the results were reliable.

Finally, Dr. Rapa outlined the future care Doe will need. To treat the psychological trauma, Dr. Rapa recommends dialectical behavioral therapy followed by cognitive behavioral therapy. Doe will also need regular psychiatrist updates, at least every six months. To coordinate all this therapy and help relieve the attendant stress on Doe and her family, Dr. Rapa also recommends a case manager. As explained by Dr. Rapa, a case manager will

5

schedule appointments for Doe and assist her with daily activities that are otherwise unfeasible because of her condition.

Based on Dr. Rapa's testimony, Doe is requesting $188,546.63 in future medical care. Attached as Appendix A is a breakdown of this figure among the various therapies and services recommended. With no objection to the evidence offered, the Court finds Doe has proven her future medical care and this amount should be awarded. *See Pruitt v. Perez-Gervert*, 41 So. 3d 286, 288 (Fla. Dist. Ct. App. 2010) (providing a claimant can recover future medical expenses when they are reasonably certain to occur and there is "an evidentiary basis upon which the jury can, with reasonable certainty, determine the amount").

Doe is also requesting $1,246,930 in lost earnings and benefits because she cannot work in her preferred field (teaching). Dr. Rapa confirmed that Doe is incapable of meeting the requirements to become a teacher. Doe's accountant, Nardotti, testified about the pay and benefits a teacher would expect to earn. Attached as Appendix B is a breakdown of this figure. With no objection to this evidence either, the Court finds Doe has proven her lost earnings and they should be awarded in full. *See Volusia Cnty. v. Joynt*, 179 So. 3d 448, 450 (Fla. Dist. Ct. App. 2015) (explaining Florida law allows

recovery of lost earning capacity "when such damages are established with reasonable certainty").[2]

Finally, Doe is seeking damages for pain and suffering. She claims $10,000,000 will sufficiently compensate her for the trauma inflicted by Vazquez. At first blush, this number seems high. But once measured against the undisputed testimony, the Court finds it appropriate. Doe is effectively disabled. She can't socialize, can't hold gainful employment, and can't regulate her emotions to navigate the everyday events of life. This leaves Doe housebound and dependent on her mother for care. Dr. Rapa also testified that Doe could remain in this condition indefinitely, even with psychiatric care. Considering this standard of living, the damages requested are not extraordinary or unreasonable. *See Rozar v. R. J. Reynolds Tobacco Co.*, 292 So. 3d 1202, 1207 (Fla. Dist. Ct. App. 2020) ("Damages for pain and suffering are difficult to calculate, have no set standard of measurement, and for this reason are uniquely reserved to [the fact-finder] for their decision."); *Markland v. Norfolk Dredging Co.*, 772 F. Supp. 1241, 1243 (M.D. Fla. 1991) ("Each award for pain and suffering depends heavily on its facts.").

---

[2] Doe's figure for future earnings is not brought to its present value. Florida law requires present value calculations. *See Nationwide Mut. Fire Ins. Co. v. Darragh*, 95 So. 3d 897, 898 (Fla. Dist. Ct. App. 2012). But Pennsylvania does not. *See Kaczkowski v. Bolubasz*, 491 Pa. 561, 583 (1980). Doe thus requests that the Court attribute her lost earnings to her Pennsylvania claims. With no objection, the Court recommends adopting this approach and awarding her the full relief sought.

Two outlying issues to wrap up. First, Doe asks that her legal name be listed on the final judgment to avoid any confusion about who it belongs to. This is sensible since a judgment for "Jane Doe" would provide little protection to either party. To accommodate Doe's request, the Court recommends that she be permitted to email her legal name to chambers for inclusion on the final judgment. Second, Doe is seeking to recover attorney's fees. Consistent with Local Rule 7.01, Doe should be directed to file an appropriate motion within fourteen days of the final disposition of this Report and Recommendation.

For these reasons, it is **RECOMMENDED** that the Court:

1. Direct counsel to email Doe's legal name to chambers for inclusion on the judgment.

2. Enter a judgment in Doe's favor under her legal name and against Vazquez in the amount of $11,435,476.63.

3. Direct Doe to file an appropriate motion under Local Rule 7.01 to recover attorney's fees within fourteen days of a decision on this Report and Recommendation.

4. Direct the Clerk to mail a copy of the order to Vazquez at his last known address in the Court file.

5. The Clerk is directed to mail a copy of this Report and Recommendation to Vazquez at his last known address in the Court file.

**ENTERED** in Fort Myers, Florida on July 26, 2023.

_Kyle C. Dudek_
United States Magistrate Judge

**NOTICE TO PARTIES**

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. _See_ 11th Cir. R. 3-1. To expedite resolution, parties may file a joint notice waiving the 14-day objection period.

Copies:  All Parties of Record

```
                    PRESENT VALUE CALCULATIONS FOR
                            ███████████


   LIFE EXPECTANCY    86

   INTEREST RATE      3.855%


   SERVICE:                                        PRESENT VALUE:

   DBT THERAPY
        $300 PER WEEK @ 52 = 15,600                  15,304.08

   CBT
        $300 PER WEEK @ 52 = 15,600 (YR2)            14,737.92
        $300 PER WEEK @ 52 = 15,600 (YR3)            14,192.00
                                                   ---------
        SUBTOTAL                                              44,234.00

   CASE MANAGEMENT
        $45 X 2 X 13 (3 MTHS) = 1,170                 1,146.08
        $45 X 1 X 52          = 2,340                 2,295.46
        $45 X 1 X 12          =   540                   509.44
                                                   --------
        SUBTOTAL                                               3,950.98

   PSYCHIATRIC EVALUATION
        $450 EVERY SIX MONTHS x 66.2 = 59,580        21,503.56
        MONTHLY UPDATES
        $300 X 12 X 66.2 = 238,320                   86,092.40
                                                   ---------
        SUBTOTAL                                             107,595.96
                                                            ----------
   TOTAL BEFORE PSYCHIATRIC HOSPITALIZATION                  155,780.94


   PSYCHIATRIC HOSPITALIZATION:

   4 TIMES    $1200 X 14 = 16,800 X 4 = 67,200               19,725.85
   5 TIMES    $1200 X 14 = 16,800 X 5 = 84,000               26,222.54
   6 TIMES    $1200 X 14 = 16,800 X 6 =100,800               32,765.69



   PREPARED BY :
        [signature]
   ANTHONY M NARDOTTI CPA
```

Appendix A

PSYCHIATRIC HOSPITALIZATION

    4-6 TIMES; 2 WEEKS @ $1200 PER DAY = $16,800

| 4 TIMES | 15 | 30 | 45 | 60 | |
|---|---|---|---|---|---|
| PRESENT VALUE: | | | | | |
| 19,725.85 | 9,525.73 | 5,401.16 | 3,062.50 | 1,736.46 | |
| ========= | | | | | |

---

| 5 TIMES | 12 | 24 | 36 | 48 | 60 |
|---|---|---|---|---|---|
| PRESENT VALUE: | | | | | |
| 26,222.54 | 10,670.39 | 6,777.22 | 4,304.50 | 2,733.97 | 1,736.46 |
| ========= | | | | | |

---

| 6 TIMES | 10 | 20 | 30 | 40 | 50 | 60 |
|---|---|---|---|---|---|---|
| PRESENT VALUE: | | | | | | |
| 32,765.69 | 11,508.94 | 7,884.26 | 5,401.16 | 3,700.10 | 2,534.77 | 1,736.46 |
| ========= | | | | | | |

---

PRESENT VALUE CALCULATED USING $16,800 FOR ALL PERIODS AND INTEREST RATE OF 3.855%

Appendix A

███ - LOSS OF WAGES

| | TOTAL OFFSET METHOD* |
|---|---|
| Pennsylvania | |
| PRESENT ANNUAL WAGES | $23,400 |
| STARTING TEACHER SALARY LEE COUNTY, FL ** | $48,250 |
| Difference | $24,850 |
| X ESTIMATED 30 YEAR CAREER | x 30 |
| TOTAL DIFFERENCE IN WAGES | $745,500 |

\* "Under the total offset method, a court does not discount the award to its present value but assumes that the effect of the future inflation rate will completely offset the interest rate, thereby eliminating any need to discount the award to its present value." Kaczkowski v. Bolubasz, 491 PA 561 (1980)

\*\* COLLECTIVE BARGAINING AGREEMENT BETWEEN THE SCHOOL DISTRICT OF LEE COUNTY AND THE TEACHERS ASSOCIATION OF LEE COUNTY

Prepared by:

*[signature]*

ANTHONY M. NARDOTTI CPA

Appendix B

SAGER - LOSS OF BENEFITS

Pennsylvania                          TOTAL OFFSET METHOD*

|  | HEALTH INSURANCE | FLORIDA RETIREMENT SYSTEM (EST) |
|---|---|---|
| TEACHERS LEE COUNTY, FL | $9,213.60** | $5,746.57** |
| X ESTIMATED 30 YEAR CAREER | x 30 | x 30 |
| ESTIMATED LOST BENEFITS | $ 276,408 | $ 172,397 |

\* "Under the total offset method, a court does not discount the award to its present value but assumes that the effect of the future inflation rate will completely offset the interest rate, thereby eliminating any need to discount the award to its present value." Kaczkowski v. Bolubasz, 491 PA 561 (1980)

\*\* COLLECTIVE BARGAINING AGREEMENT BETWEEN THE SCHOOL DISTRICT OF LEE COUNTY AND THE TEACHERS ASSOCIATION OF LEE COUNTY

Prepared by:

*[signature]*

ANTHONY M. NARDOTTI CPA

Appendix B

# TALC

## Collective Bargaining Agreement Between The School District of Lee County and The Teachers Association of Lee County




**FY23 (2022-2023 School Year)**
**FY24 (2023-2024 School Year)**
**FY25 (2024-2025 School Year)**

## FEBRUARY 2023

Appendix B

# The School District of Lee County
PERSONAL • PASSIONATE • PROGRESSIVE

Donate     

🏠 > Our District > Departments > Human Resources > Compensation & Labor Relations > Salary Schedules > Instructional Staff - Starting Salary   

# Starting Salary Schedule Calculator (Instructional Staff)

For new hire instructional applicants, please fill out the below fields to determine your estimated compensation.

How many Florida Public years of instructional experience do you have?



How many Out of State Public years of instructional experience do you have?



[Display Estimated Salary]

# Starting Salary Schedule (Instructional Staff)

Base Salary (estimated): **$48,250.00**

## Board Paid Benefits

Estimated Florida Retirement System: **$5,746.57**
Health/Life Insurance: **$9,213.60**
Dependent Care Insurance: **$4,000.00**
Social Security Contribution: **$3,691.13**

**Estimated Total Compensation and Benefits Package: $70,901.30**

**Board Paid Retirement:** The current Retirement System (FRS) contribution rate is 11.91%. The current employer contribution to Social Security is 7.65%.

**Board Paid Insurance:** The Board currently contributes $9,213.60 annually for Employee Health Insurance and $33.84 annually for Employee Life Insurance.

## Additional Compensation Opportunities

**Advanced Degree Supplements:**
F.S. 1012.22 (1)(c)3 For instructional personnel hired on or after July 1, 2011, credit for the advanced degree held must be in the individual's area of certification and paid as a salary supplement.

**Masters Degree:** $2,531.25 per year
**Specialist Degree:** $4,050.00 per year
**Doctorate Degree:** $5,062.50 per year

For more information, please review TALC Contract Article 10 (Compensation). Email general questions to Careers@leeschools.net.

FL000S0 Mon Jun 26 2023 15:28:40 GMT-0400 (Eastern Daylight Time)

## Helpful Links:

- TALC Contract
- PeopleSoft Log-In Page
- Florida Retirement System - Member Resources Website
- School District of Lee County Insurance and Benefits Website
- School District of Lee County Staffing and Talent Management Website

 - LOSS OF PRODUCTIVITY

Pennsylvania

LONGEVITY PAY SUPPLEMENT*
TEACHERS LEE COUNTY, FL

| | | | |
|---|---|---|---|
| YEARS 10-14 | $   625 | x 5 | $ 3,125 |
| YEARS 15-19 | $1,250 | x 5 | $ 6,250 |
| YEARS 20-24 | $2,500 | X 5 | $12,500 |
| YEARS 25-29 | $5,000 | X 5 | $25,000 |
| YEAR  30    | $6,250 | X 1 | $ 6,250 |
| TOTAL | | | $53,125 |

* COLLECTIVE BARGAINING AGREEMENT BETWEEN THE SCHOOL DISTRICT
OF LEE COUNTY AND THE TEACHERS ASSOCIATION OF LEE COUNTY page 63.

Prepared by:

_____
ANTHONY M. NARDOTTI CPA

Appendix B